# No. 22-2067

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

JANICE HARGROVE WARREN, *Plaintiff-Appellee*

v.

MIKE KEMP, LINDA REMELE, SHELBY THOMAS, ALICIA GILLEN, ELI KELLER, and BRIAN MAUNE, in their official capacities as members of the board of the Pulaski County Special School District and in their individual capacities, and PULASKI COUNTY SPECIAL SCHOOL DISTRICT,

*Defendants-Appellants*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS, CENTRAL DIVISION, No. 4:19-cv-00655-BSM
THE HONORABLE BRIAN S. MILLER, PRESIDING

---

## APPELLANTS' BRIEF WITH ADDENDUM

BEQUETTE, BILLINGSLEY & KEES, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201-3469
Phone: (501) 374-1107
Fax: (501) 374-5092
Email: jbequette@bbpalaw.com
Email: ckees@bbpalaw.com

By: _____/s/ W. Cody Kees_____
    Jay Bequette, Ark. Bar #87012
    W. Cody Kees, Ark. Bar #2012118

*Attorneys for Appellants*

## Summary of the Case and Request for Oral Argument

Dr. Janice Warren, a black female, served as the interim superintendent for the Pulaski County Special School District from 2017–18. Although Warren applied for the permanent superintendent position, she did not make the finalist cutdown. The job was ultimately offered to a white male, Dr. Charles McNulty. After Warren's interim contract expired, she resumed her previous job as an assistant superintendent for the district. In 2019, Warren filed suit alleging that the district and individual members of the school board discriminated and retaliated against her by not interviewing or hiring her for the permanent superintendent position.[1]

The jury returned a verdict in the district's favor on Warren's race-discrimination, sex-discrimination, and breach-of-contract claims. The jurors found for Warren on her retaliation claims. After several post-verdict adjustments, the district court entered a final judgment. Appellants seek a reversal of the judgment and request thirty minutes for oral argument. This fact-intensive record is very large and further explanation beyond the written briefs would benefit the Court's understanding of the case.

---

[1] Warren later included a breach-of-contract claim.

i

**Corporate Disclosure Statement**

Appellants do not have to file a corporate disclosure statement because no appellant is a "nongovernmental corporate party in a court of appeals" under Federal Rule of Appellate Procedure 26.1.

Appellate Case: 22-2067    Page: 3    Date Filed: 09/23/2022 Entry ID: 5202262

# Table of Contents

Summary of the Case and Request for Oral Argument ................................... i

Corporate Disclosure Statement ...................................................... ii

Table of Contents ................................................................. iii

Table of Authorities............................................................... vi

Jurisdictional Statement ........................................................... 1

Statement of Issues ................................................................ 2

Statement of the Case ............................................................. 4

Summary of the Argument........................................................... 24

Argument ......................................................................... 26

I.  The standard of review is de novo.............................................. 26

II.  Retaliation Claims ............................................................ 26

A.    Warren did not engage in a protected act when she reported disparities between the athletic facilities at Mills High School and Robinson Middle School. ......................................................... 29

   *(1)   Under this Court's binding precedent, a school employee's report about racial discrimination is not a protected act when it does not relate to an unlawful employment practice.* ................................ 30

   *(2)   Other jurisdictions hold that an employee's act of reporting discrimination on behalf of a third party is not protected when the discriminatory act does not relate to an employment practice.* ................ 32

   *(3)   Because Warren did not complain about an employment practice to her employer, the judgment for retaliation must be reversed as a matter of law.* ........................................................ 33

   *(4)   Warren acted within the scope and course of her employment in opposing the district's allegedly discriminatory conduct, so the judgment for retaliation must be reversed.* ................................. 35

iii

*(5)    The record does not support the conclusion that Warren had a good faith, reasonable belief that she was opposing an unlawful employment practice given the totality of the circumstances.* .................... 36

B.    Warren did not establish an adverse employment action, because she resumed her previous position as assistant superintendent after the board hired McNulty. ................................... 37

C.    Warren has not shown that "but for" her protected act, she would have been interviewed as a finalist and hired as the permanent superintendent. .................................... 40

D.    The district established nondiscriminatory reasons why Warren was not interviewed as a finalist or hired as permanent superintendent. ....... 42

E.    The record shows that Warren did not rebut the board's nondiscriminatory reasons for selecting the interview finalists and its eventual hire of McNulty. ................................... 45

F.    Warren failed to prove one or more elements of her claims for retaliation, so the related damages award must be reversed........................... 47

III. Punitive Damages ........................................ 47

A.    Because there is insufficient evidence as a matter of law to support Warren's retaliation claim, the jury's award of punitive damages cannot stand. ................................... 48

B.    The Supreme Court of the United States only allows a recovery of punitive damages if the plaintiff proves intentional discrimination, the plaintiff was the person harmed, and the defendant's conduct was illegal........................... 49

C.    The law does not allow Remele and Gillen to be held liable as individuals for punitive damages under Title VII.......................... 51

D.    The law does not allow Remele and Gillen to be held liable as individuals for punitive damages under Section 1981.................................... 51

E.    Warren did not establish that Remele or Gillen acted with malice or with reckless indifference to her protected rights. ...................... 52

Conclusion ................................... 57

iv

Certificate of Compliance ............................................................. 58

Certificate of Service ................................................................... 59

Appellate Case: 22-2067    Page: 6    Date Filed: 09/23/2022 Entry ID: 5202262

# Table of Authorities

## Cases

*Artis v. Francis Howell*, 161 F.3d 1178 (8th Cir. 1998)........................ 3, 30, 34

*Bakhtiari v. Lutz*, 507 F.3d 1132 (8th Cir. 2007) ............................................. 45

*Barker v. Mo. Dep't of Corr.*, 513 F.3d 831 (8th Cir. 2008) ........................... 29

*Branscomb v. Sec'y of Navy*, 461 F. App'x 901 (11th Cir. 2012) ................... 28

*Brush v. Sears Holdings Corporation*, 466 F. App'x 781 (11th Cir. 2012)................................................................................................ 33

*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) ................... 26, 27

*CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008)............................ 51, 52

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009 (2020)................................................................................. 28, 53

*Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271 (2009).................................................................................................. 27

*EEOC v. Gaddis*, 733 F.2d 1373 (10th Cir. 1984) ......................................... 53

*EEOC v. Kohler Co.*, 335 F.3d 766 (8th Cir. 2003) ........................................ 41

*EEOC v. N. Mem'l Health Care*, 908 F.3d 1098 (8th Cir. 2018).................... 36

*Evans v. Kansas City School District*, 65 F.3d 98 (8th Cir. 1995)........... passim

*Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871 (8th Cir. 2000) ......................................................................................... 49

*General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375 (1982) ...... 52

*Givens v. Cingular Wireless*, 396 F.3d 998 (8th Cir. 2005) ........................... 38

*Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968 (8th Cir. 1994) ....................... 45

*Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786 (8th Cir. 2019)............... 26

*Henthorn v. Capitol Communs., Inc.*, 359 F.3d 1021 (8th Cir. 2004)............. 38

Appellate Case: 22-2067     Page: 7     Date Filed: 09/23/2022 Entry ID: 5202262

*Howard v. Burns Bros*., 149 F.3d 835 (8th Cir. 1998) ................................... 47

*Jin Ku Kim v. Nash Finch Co*., 123 F.3d 1046 (8th Cir. 1997)................ 49, 53

*Kimzey v. Wal-Mart Stores*, 107 F.3d 568 (8th Cir. 1997) ............................ 26

*Knott v. Missouri Pac. R. Co*., 527 F.2d 1249 (8th Cir. 1975)...................... 29

*Kolstad v. ADA*, 527 U.S. 526 (1999) ........................................................ 3, 50

*Lawrence v. CNF Transportation, Inc*., 340 F.3d 486 (8th Cir. 2003) .......... 54

*Lenhardt v. Basic Institute of Technology*, 55 F.3d 377 (8th Cir. 1995) ..... 3, 51

*Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738 (8th Cir. 2011)..................... 5

*Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist*., 778 F.2d 404
    (8th Cir. 1985)........................................................................................ 4

*McCullough v. Univ. of Ark. for Med. Scis*., 559 F.3d 855 (8th Cir.
    2009) ............................................................................................... 27, 28

*McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)................. 27

*Omogbehin v. Cino*, 485 F. App'x 606 (3d Cir. 2012).................................... 28

*Philip Morris USA v. Williams*, 549 U.S. 346 (2007)..................................... 50

*Singletary v. Mo. Dep't of Corr*., 423 F.3d 886 (8th Cir. 2005)..................... 27

*State Farm Mut. Auto. Inc. Co. v. Campbell*, 538 U.S. 408 (2003)............... 50

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248
    (1981).................................................................................................... 27

*Twymon v. Wells Fargo & Co*., 403 F.Supp.2d 921 (S.D. Iowa 2005) ........... 38

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).................. 27, 40

*Wedow v. City of Kan. City*, 442 F.3d 661 (8th Cir. 2006)............................. 26

*Wilking v. Cty. of Ramsey*, 153 F.3d 869 (8th Cir. 1998) ............................... 45

*Wimmer v. Suffolk County Police Department*, 176 F.3d 125 (2d Cir.
    1999) .................................................................................................... 33

Appellate Case: 22-2067    Page: 8    Date Filed: 09/23/2022 Entry ID: 5202262

*Wright v. St. Vincent Health Sys.*, 730 F.3d 732 (8th Cir. 2013) ..................... 40

**Statutes**

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1331 ............................................................................ 1

28 U.S.C. § 1343(3) ........................................................................ 1

28 U.S.C. § 1367(a) ........................................................................ 1

42 U.S.C. § 1981a ................................................................. 3, 49, 50

42 U.S.C. § 2000e-3 ...................................................................... 30

42 U.S.C. § 2000e(b) ...................................................................... 51

42 U.S.C. § 2000e-16 ..................................................................... 28

42 U.S.C. § 2000e-2 ................................................................... 3, 34

42 U.S.C. § 2000e-3 ...................................................... 3, 27, 28, 29

42 U.S.C. § 2000e-5 ................................................................... 3, 50

**Rules**

Fed. R. App. P.–Civ. 4 .................................................................... 1

Fed. R. Civ. P. 50(b) ...................................................................... 1

Fed. R. Civ. P. 59 .......................................................................... 1

Appellate Case: 22-2067     Page: 9     Date Filed: 09/23/2022 Entry ID: 5202262

## Jurisdictional Statement

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) over Janice Warren's civil rights action alleging discrimination and retaliation. The district court also properly exercised supplemental jurisdiction over Warren's state law claim for breach of contract. 28 U.S.C. § 1367(a). On March 10, 2022, the district court entered a judgment that disposed of all claims in the action. Appellants' Addendum ("Add.") at 31. Twelve days later on March 22, appellants asked for judgment as a matter of law and for the district court to alter or amend its judgment. Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59. Add. 32. The court denied the posttrial motion within 30 days. Add. 34. On May 20, 2022, appellants filed a timely notice of appeal. Fed. R. App. P.–Civ. 4(a)(1)(A)(i),(iv). Add. 41. This Court has jurisdiction over the district court's final decision pursuant to 28 U.S.C. § 1291.

Appellate Case: 22-2067   Page: 10   Date Filed: 09/23/2022 Entry ID: 5202262

**Statement of Issues**

- **Retaliation**. To establish a retaliation claim, an employee must show that he or she engaged in a *protected act*, suffered an adverse employment action, and that there was a causal connection between the two. In 2017, district employee Dr. Janice Warren reported that certain inequities existed between new athletic facilities built at Mills High School located in a predominately black area, and those built at Robinson Middle School, located in a predominately white area. Did the district retaliate against Warren?

- **Punitive Damages**. A plaintiff must establish that a defendant acted with malice or reckless indifference to collect punitive damages. Here, the district-court judgment included $50,000 in punitive damages assessed against individual defendants Linda Remele and Alicia Gillen, members of the PCSSD school board. Does the law allow the plaintiff to collect punitive damages against these two individual school board members?

2

**Apposite Cases and Statutory Provisions**

**Retaliation**. *Evans v. Kansas City School District*, 65 F.3d 98 (8th Cir. 1995); *Artis v. Francis Howell*, 161 F.3d 1178 (8th Cir. 1998); 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 2000e-2.

**Punitive Damages**. *Kolstad v. ADA*, 527 U.S. 526 (1999); *Lenhardt v. Basic Institute of Technology*, 55 F.3d 377 (8th Cir. 1995); 42 U.S.C. § 1981a(b)(1); 42 U.S.C. § 2000e-5(g)(2).

3

## Statement of the Case

**Background: The Federal District Court's Supervision.** The Pulaski County Special School District (PCSSD) came under federal court supervision when the predominately black Little Rock School District sued the predominately white PCSSD, North Little Rock School District, and the State of Arkansas in 1982. *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist.*, 778 F.2d 404 (8th Cir. 1985). Among other things, this Court ordered that the schools develop desegregation plans to establish unitary, racially integrated districts. *Id*.

In 2000, the parties reached an agreement. PCSSD promised that it "would prepare, with the help of consultants, as necessary, a plan so that existing school facilities are clean, safe, attractive, and *equal*." Plaintiff's Exhibit No. 4, at 4 (emphasis added). The Plan 2000 agreement also allowed a class of black children and their parents, called the Joshua Intervenors (later known as the McClendon Intervenors), to provide substantial input about the condition and construction of school facilities in the district. Plaintiff's Exhibit No. 4, at 5.

In June 2011, the Arkansas Department of Education declared PCSSD financially distressed, dissolved the school board, and removed its

4

superintendent. TR., Vol. 2, p. 89. The Commissioner of Education became the individual acting as the school board, and Dr. Jerry Guess, a white male, was appointed as superintendent. TR., Vol. 2, p. 89; TR., Vol. 3, p. 595. In December 2011, this Court affirmed that the district had spent a disproportionate amount of its budget on facilities in predominately white areas. *Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738, 753 (8th Cir. 2011). The district court overseeing the desegregation plans gave Guess the ultimate authority and responsibility of complying with the Plan 2000 agreement regarding school facilities during the state's takeover. TR., Vol. 2, pp. 103, 176–77.

In 2012, Guess hired Warren as the director of the district's elementary education program. TR., Vol. 2, p. 106. Warren had 34 years of leadership experience as an elementary school teacher and as the first black superintendent in Crossett School District. TR., Vol. 5, pp. 1027, 1030; TR., Vol. 3, pp. 442–43. Guess promoted Warren to be PCSSD's interim assistant superintendent for equity and pupil services, agreeing that she was "the chief deseg officer at the district" starting in 2013. TR., Vol. 2, pp. 184, 107. Warren's job responsibilities included meeting with the Joshua Intervenors and the Office of Desegregation's monitoring groups. TR., Vol. 2, pp. 187, 213–14.

Appellate Case: 22-2067    Page: 14    Date Filed: 09/23/2022 Entry ID: 5202262

Margie Powell, a court-appointed expert tasked with overseeing certain areas still under court supervision (including school facilities), testified that Warren was excellent at overseeing desegregation efforts in the district. TR., Vol. 2, p. 213. According to Powell, Warren's approach to desegregation monitoring was "very open . . . She didn't try to hide anything. If something went wrong, she would mention it. . . . She was . . . very candid." TR., Vol. 2, p. 214. Board member Linda Remele, who supervised Warren prior to serving on PCSSD's board, described Warren as a "good team player." TR., Vol. 3, p. 644.

**Warren's One-Year Term as Interim Superintendent**. In January 2017, the district returned to local control. Voters elected seven school board members:

- Alicia Gillen (white female)
- Officer Eli Keller (white male)
- Mayor Mike Kemp (white male)
- Brian Maune (white male)
- Dr. Linda Remele (white female)
- Reverend Shelby Thomas (black male)
- Tina Ward (black female)

TR., Vol. 2, p. 183; TR., Vol. 3, p. 605; Plaintiff's Exhibit 43.

After a late-night meeting in July 2017, board members voted 6 to 1 to fire Superintendent Guess, primarily because Guess wanted to use "his own attorneys" instead of the attorney that the board wished to use for the ongoing

6

desegregation case.  TR., Vol. 3, pp. 692–93, 489; TR., Vol. 4, p. 909; TR., Vol. 5, p. 1042.  The board hired Warren to serve as the district's interim superintendent for one year.[2]  TR., Vol. 3, p. 696; Plaintiff's Exhibit 28.  After her tenure as interim superintendent expired, Warren returned to her previous position with the district as assistant superintendent of equity.  TR., Vol. 2, pp. 323, 334.

**The Mills and Robinson Facilities.**  During the five years that the Commissioner served as PCSSD's board, several agreements about school facilities were made.  TR., Vol. 2, p. 118.  The Joshua Intervenors and PCSSD agreed to build two new high schools: one at Mills in a predominately black area, and one at Robinson, in a predominately white area, at a cost of roughly $50 million each.  TR., Vol. 2, p. 118; TR., Vol. 3, p. 503.  But this initial building plan was contingent on a millage increase, and Pulaski County voters did not pass the increase.  TR., Vol. 2, p. 118.  A second plan emerged, which was to use $80 million to build a new Mills High School and a new middle school on the Robinson campus—with the Mills building to be completed first. TR., Vol. 3, pp. 510, 528; Plaintiff's Exhibit 42.

---

[2] Guess had initially recommended Warren for the open position of deputy superintendent in June 2017, but the board did not accept Warren for the deputy position.  TR., Vol. 5, p. 1040.  A few weeks later, it fired Guess and hired Warren for the interim superintendent position.

7

In March 2016, architects submitted a $55 million proposal for Mills High School to Guess; Derek Scott, the PCSSD facilities executive director; and John Walker, an attorney for the Joshua Intervenors. TR., Vol. 3, pp. 547, 550–51, 558; Plaintiff's Exhibit 53. The Mills proposal was initially approved, but Derek Scott later reduced the budget for the Mills project to $35 million. TR., Vol. 4, at 522, 558. The district had authorized Scott to oversee these projects. TR., Vol. 2, p. 154. The result was that significant disparities appeared between the new buildings on the Mills campus and those on the Robinson campus—noticeably in the new athletic facilities associated with each school. Some differences included:

- *Construction materials*. There were masonry walls at Robinson and "metal tin" walls at Mills.

- *Weight room*. The weight room at Robinson was 2700 square feet larger than the one at Mills.

- *Gym seating*. Robinson had theater-style padded seats in its basketball arena, and Mills had "glorified folded chairs" in its gymnasium.

Plaintiff's Exhibit 35, at 2–3; Plaintiff's Exhibit 3, at 27–28.

**Warren's Knowledge About the Facilities' Differences**. According to Warren, she first learned about the differences between Mills and Robinson when an outraged parent called her office in August 2017. TR., Vol. 5, p. 1052.

8

At that point, the athletic facilities were nearing completion. The outraged parent reported that "what you have done in PCSSD is build a state-of-the-art Razorback stadium for the white kids in Robinson. And for us here in the Mills feeder, it's nice, but it's nothing compared to it." TR., Vol. 5, p. 1052.

Yet a concern about the lower quality of the Mills facilities had been raised and argued by John Walker, an attorney for the Joshua Intervenors, at a meeting facilitated by Warren in November 2016. Plaintiff's Exhibit 70. This meeting occurred while Warren served as assistant superintendent for equity and was in charge of the district's desegregation efforts. Plaintiff's Exhibit 70. At that time, in November 2016, the reduced budget for the Mills facilities had been finalized by Scott and approved by Guess. Plaintiff's Exhibit 70. At the meeting, Walker nonetheless "continued to emphasize the inequities in the facilities" and said that the district "was doing the bare minimum for black students." Plaintiff's Exhibit 70, at 2. He compared the replacement Mills facility to the Pulaski County Jail. Plaintiff's Exhibit 70, at 2.

When asked why she did not recognize the facilities' inequities until the parent complained in August 2017, Warren said that she had been reassured by Guess that the district was "on target." TR., Vol. 5, p. 1105. Warren later recounted that "unfortunately." TR., Vol. 5, p. 1106. Walker had, in fact, been correct about the inequities in the facilities when he spoke up about the Mills

9

project in November 2016.  TR., Vol. 5, p. 1106.  But according to board member Alicia Gillen, Warren would have been included in the Mills facilities' budgeting planning because the supervising federal judge had designated a specific amount of money "that was needed to go to Mills for equity services directly."  TR., Vol. 4, p. 928; *see also* Plaintiff's Exhibit 37, at 9.  Gillen recounted that Warren had been the assistant superintendent for desegregation for the past four years with a responsibility to make sure the district followed Plan 2000.  TR., Vol. 4, p. 936. In her testimony, Gillen referenced Warren's 2016 summary from a meeting with Walker wherein Warren specifically wrote that "there is a gross disparity when a new middle school costs more to build than a new high school."  TR., Vol. 4, p. 933.

**Warren's August 2017 Investigation**.  As interim superintendent, Warren promptly investigated the parent complaint.  First, she obtained a video of the two properties at Mills and Robinson to compare them.  TR., Vol. 5, p. 1052.  After viewing the video, she immediately called all board members and the district's attorney.  TR., Vol. 5, p. 1054.  "[O]h my" was the reported response of the district's attorney to the situation.  TR., Vol. 5, p. 1055.  School board member and former deputy superintendent Linda Remele testified that she was "shocked" when she saw the video.  TR., Vol. 3, p. 617.  She said, "It hurt me."  TR., Vol. 3, p. 617.  When Remele went to the athletic facilities to

10

view them in person, she said that "steam was coming out of [her] ears" because it was obvious that there was a "big difference" between the two campuses. TR., Vol. 3, pp. 618–20. She set about to remedy the deficiencies at Mills immediately. TR., Vol. 3, p. 621. While the inequities made Remele's "heart sick," she was "very thrilled" that Warren brought them to the board's attention in time so they could be fixed. TR., Vol. 3, p. 701.

School board member Alicia Gillen testified that she suspected long before Warren called the board members on August 28, 2017, that there were significant problems with the schools' facilities. TR., Vol. 4, p. 924. She said that when she was seated as a board member in January 2017, she had asked Superintendent Guess specific questions about the facilities and felt that he was not being honest, so she submitted requests under Arkansas's Freedom of Information Act to find out more information. TR., Vol. 4, p. 961. According to Gillen, facilities were an important issue to the board because it "was the one thing that was holding up our district for unitary status." TR., Vol. 4, p. 925; *see also* Plaintiff's Exhibit 3 (noting facilities was one area in which PCSSD was noncompliant).

**The September 2017 Status Report to the District Court**. In addition to Warren's video and call to the board in August 2017 about the inequities between the athletic facilities at the Mills and Robinson in August 2017, the

11

board also learned that the actual construction costs for these building projects were much higher than what had been budgeted. TR., Vol. 2, p. 270. PCSSD Chief Financial Officer Denise Palmer testified that this was because Derek Scott had misrepresented material facts about the construction to the board. TR., Vol. 2, pp. 271–73; *see also* TR., Vol. 4, p. 743; TR., Vol. 3, p. 631 (agreeing that Scott's statements to board were lies). Scott resigned on August 29, 2017, and his replacement, a black man named Curtis Johnson, testified that both building projects were in a $20 million deficit when he arrived on the job. TR., Vol. 3, p. 513; Plaintiff's Exhibit 80. Ultimately it was determined that Scott had "favored the Robinson project and squeezed the Mills projects." Plaintiff's Exhibit 3, at 27.

There were varying recollections at trial about what happened after Warren called the school board members and the district's attorney Sam Jones to show them the video of the athletic facilities. Remele testified that she had asked Warren not to discuss the issue with others until Remele had the chance to look at the facilities in person. TR., Vol. 3, pp. 628–29. All board members except Mike Kemp came to Warren's office to view the video. TR., Vol. 5, p. 1054. The board members asked Warren to keep them updated on "all legal issues." TR., Vol. 4, pp. 923, 777, 811, 908.

Appellate Case: 22-2067     Page: 21     Date Filed: 09/23/2022 Entry ID: 5202262

Warren said that Sam Jones, the district's attorney, told her that the district needed to revise the status report that it had just filed in district court a few days before, and that the district judge and the Joshua Intervenors needed to hear this concerning information directly. TR., Vol. 5, p. 1055. The next status hearing in federal court was scheduled for September 8. TR., Vol. 5, p. 1056. When asked at trial if she provided any sort of notice to the board members about the September 8 hearing or presented a draft of the district's updated status report, Warren answered that she remembered forwarding an email that Jones had sent her. TR., Vol. 5, p. 1056.

The forwarded emails were entered as evidence in the trial. On September 5, 2017, at 2:23 p.m., Sam Jones sent Warren a "new draft" of a supplemental status report. Plaintiff's Exhibit 5, at 2. Warren forwarded Jones's email to the board at 3:10 p.m. stating:

> Board
> Please read the attached. Sam and I met this morning trying to finalize our report to Judge Marshall. While many questions are still unanswered our goal is to be transparent. There is still much to be discovered but after 3 meetings with WD&D and Baldwin and Shell I am hopeful the Mills project will get on track and meet court requirements. Call me if you have questions.
> Janice

Plaintiff's Exhibit 5, at 2. At 6:18 p.m., Alicia Gillen replied,

> Has this been filed? It says draft on the subject line but has an electronic file date in the body of the document. Has anyone on the board seen this before today?

13

No one on the board, in fact, had seen the legal document before that day, and by the time Gillen checked her email, the document had already been filed in federal court at 6 p.m.  TR., Vol. 4, pp. 925, 775; Plaintiff's Exhibit 6.

At 5 p.m., Warren, in a separate email chain, had warranted to Jones that the school board had been "fully informed" about the revisions.  Defendants' Exhibit 5.  This was after Jones had emailed Warren at 4:27 p.m. telling her that he was about to file the report.  Appellants' Appendix ("App.") at 221; R. Doc. 27-10, at 2; Defendants' Exhibit 5, at 2.

**Tensions after the September 5 Revised Status Report.**  There was relational fallout from Warren's giving the go-ahead to Jones to file the revised status report without receiving any feedback or input from board members. Remele and Gillen were upset about the particular wording choices in the document, the report's tone, and how it made the district appear in the newspaper.  TR., Vol. 3, pp. 625–27, 656; TR., Vol. 4, pp. 919–26.  Remele said something to Warren to the effect that "we don't air our dirty laundry in public." TR., Vol. 5, p. 1060; TR., Vol. 3, pp. 650, 656, 692.  Warren said there was friction between herself and Remele and Gillen moving forward.  TR., Vol. 5, p. 1060.

On September 6, Warren sent a proposed press-release statement about the supplemental status report.  Plaintiff's Exhibit 5, at 3.  The board members,

14

according to Warren, were more concerned about the unflattering information becoming public than they were about the inequities that the video showed. TR., Vol. 5, p. 1059. Yet the subsequent history in the case shows that the board unanimously voted in favor of every effort to try to correct the inequities between the Mills and Robinson facilities. TR., Vol. 4, p. 726; Plaintiff's Exhibit No. 3. In Remele's words, "the district had done the wrong thing," but it was committed to fixing the problem and finding solutions. TR., Vol. 3, pp. 630, 701; TR., Vol. 5, p. 1109.

**Complaints about Warren's Performance as Interim Superintendent**. Warren described two school board meetings on September 12 and November 14, 2017. TR., Vol. 5, pp. 1063–64. During the meetings, Remele and Gillen presented documented concerns they had about Warren's performance as superintendent. TR., Vol. 4, pp. 733–34; App. 218-19, R. Doc. 27-9, at 1-2; App. 434, R. Doc. 40-70, at 1; Defendants' Exhibits 1–2.

For example, immediately after taking the interim position, Warren removed paneling and repainted the superintendent's office and ordered new furniture. TR., Vol. 2, p. 181; TR., Vol. 3, p. 637; TR., Vol. 5, p. 1107. Warren's actions were concerning to the board because her position was temporary, the school district had just emerged from financial distress, and the existing office

furniture was "functional." TR., Vol. 2, p. 181; TR., Vol. 3, p. 638. Warren later justified her decision, stating that she was a self-described "neat freak," and the previous superintendent's office was filthy, among other reasons. TR., Vol. 5, pp. 1045–46.

Warren also purchased $2,436.84 of umbrellas as Christmas gifts for staff members. TR., Vol. 4, p. 779; Plaintiff's Exhibit 49. Only after being told that there would be an "audit finding" if the district paid for the umbrellas and being confronted by the board during an executive session did Warren pay for the umbrellas herself. TR., Vol. 4, pp. 782, 958; TR., Vol. 5, pp. 1048–50, 1113. Other board concerns included that Warren hired four testing coordinators in November 2017, but these coordinators did not actually do any testing until April 2018, which was wasteful. TR., Vol. 4, p. 893.

Warren said she felt attacked during these direct interactions with Remele and Gillen and was offended that she was instructed simply to keep "the ship afloat." TR., Vol. 5, pp. 1064, 1066. Other board members said that they did not have any problems communicating with Warren nor did they remember any tension during the board meetings. TR., Vol. 4, pp. 777, 908–09.

**The Search for a Permanent Superintendent**. There was some disagreement about when exactly the board decided to search for a new superintendent. Remele testified that the board decided to search for a

Appellate Case: 22-2067     Page: 25     Date Filed: 09/23/2022 Entry ID: 5202262

permanent superintendent on July 18, 2017, which was the day that it hired Warren. TR., Vol. 3, p. 651. Board member Eli Keller recalled that he personally "really wanted fresh eyes from outside of Arkansas" for the permanent hire. TR., Vol. 4, p. 837. Warren's position in the litigation was that the board did not decide to search for a permanent superintendent until Remele and Gillen became displeased with her performance less than two months into her contract as interim superintendent. *See* TR., Vol. 5, pp. 1059–69.

In December 2017, the board accepted a proposal from Ray & Associates—a national school executive search organization—and agreed to pay the company approximately $20,000 to help secure a permanent PCSSD superintendent. TR., Vol. 3, p. 384. Ray & Associates contacted 1,177 individuals in 47 states about the PCSSD open position, and 38 "very strong" candidates applied. TR., Vol. 5, p. 1158; Plaintiff's Exhibit 19, at 2. Nine top candidates from Arkansas, Illinois, Iowa, Pennsylvania, Tennessee, and Texas were selected from the 38 applicants. Plaintiff's Exhibit No. 19, at 2.

Warren was chosen as one of the top candidates. The nine top candidates included two black women, four black men, and three white men. Plaintiff's Exhibit 12. Each of these nine top candidates submitted video presentations to the PCSSD board. Plaintiff's Exhibits 12–13. The board members saw all nine candidates' video presentations and reviewed each candidate's application

17

package, which included the candidate's online application, resume, cover letter, and letters of recommendation.  TR., Vol. 3, p. 408.

The next step in the process was for each individual board member to complete a "consensus-building matrix" without consulting any other board member.  Plaintiff's Exhibit 83.  The matrix was designed to force each board member to independently compare each of the nine candidates and decide which one better fit the profile for the superintendent position.  TR., Vol. 3, p. 409.  Each board member's matrix was then given to Carl Davis, a Ray & Associates consultant, for scoring.  TR., Vol. 5, p. 1163; Plaintiff's Exhibit 83, at 3.

Davis then ranked the candidates using the collective matrix scores, and the board chose the top three finalists for in-person interviews.  TR., Vol. 4, p. 821; TR., Vol. 5, p. 1163.  Warren's theory of the case was that Remele and Gillen scored her very low to bring her overall score down so that she would not be in the top three.  TR., Vol. 6, p. 1308. The top three finalists selected were two black males, James Harris and Erick Pruitt, and Charles McNulty, a white male.  TR., Vol. 5, p. 1163; TR., Vol. 2, p. 291; Plaintiff's Exhibit 13. Harris subsequently withdrew his application because he lacked the statutory requirement in Arkansas that he have teaching experience, which meant that the board only interviewed Pruitt and McNulty.  TR., Vol. 2, p. 291; TR., Vol. 5,

p. 1170.  Warren—and five other top candidates—were not selected as finalists and consequently did not receive offers to interview for the permanent PCSSD superintendent position.  The handwritten matrixes or score sheets used in the finalist-selection process were not kept by the school board or Ray & Associates.  TR., Vol. 3, p. 414; TR, Vol. 5, p. 1165.

At trial, Warren presented PCSSD's written policy stating that if the ability, qualifications, and credentials of an existing employee are equal to those of an outside applicant, the existing employee is favored for promotion.  *See* Plaintiff's Exhibit 21; TR., Vol. 4, p. 978.  But Shawn Burgess, a black female chief human resource officer for the district, made the following statement on cross-examination:

> COUNSEL: Is the promotion policy, promotion and transfer policy within—in the course and scope of your work, is it applicable to a board hiring a superintendent?

> BURGESS: No, it's not.

> COUNSEL: Okay. So in your experience as the chief HR officer, this policy is not used when the board hires a superintendent?

> BURGESS: That is correct.

> COUNSEL: Okay. So then in your experience and in your role at PCSSD, this jury would not have to consider this policy as it relates to Dr. Warren's claims in this lawsuit?

19

BURGESS:     That is correct.

TR., Vol. 4, p. 997.

**Why the Board Chose McNulty as Superintendent**. School board member Brian Maune testified that he was impressed with Dr. Charles McNulty's leadership qualities and passion in the placement process. TR., Vol. 4, p. 820. Maune liked that McNulty prepared for the meeting and essentially laid out a plan in his interview to complete desegregation oversight. TR., Vol. 4, p. 821. Black board member Shelby Thomas agreed with Maune, concluding that McNulty was the "best person to help get us through deseg." TR., Vol. 4, p. 782. During the interview process, Thomas connected with McNulty's great success in erasing student achievement gaps because it aligned with Thomas's values to "care about all of our students, not just some of our students." TR., Vol. 4, p. 783. While Thomas voted for McNulty, he said that he liked Warren and that she was always "high on [his] list[.]" TR., Vol. 4, p. 783. When asked if there was any specific reason why he did not choose Warren for the permanent job, Thomas stated,

> Again, it just boiled down to the interview process. We watched video interviews. And we [sic] picked the best three to come in for the next phase of our interview process. I mean, when you go through a job interview—I have been through several job interviews myself. And you just don't get the job every time. It may not have been your day, it may not have been your week, but you just don't get the job every time, so you have to go with the

best candidate when you're in that position. It's happened to me. It's happened. That's life.

TR., Vol. 4, pp. 783–84.

The board's vote was 6 to 1 in favor of McNulty. TR., Vol. 5, p. 1172. Consultant Carl Davis testified that PCSSD was a "real good board" to work with and he agreed that nothing in his interactions with board members or in his personal observations of the selection process led him to believe that the board was acting with any racial animus or in a retaliatory manner. TR., Vol. 5, pp. 1168, 1174. In fact, Ray & Associates asked Warren to interview for other superintendent jobs after the board offered McNulty the PCSSD position. TR., Vol. 3, p. 438.

**What Happened After McNulty Was Hired**. After McNulty was hired as superintendent, Warren continued as assistant superintendent to lead the team that helped the district with desegregation efforts and compliance with Plan 2000. TR., Vol. 2, pp. 304–06. She was a key witness for the district in a 2020 desegregation compliance trial. *See* Plaintiff's Exhibit 3.

Warren continued her positive contributions to the district even after being rejected for the permanent superintendent position. McNulty gave Warren leadership over a college-readiness program supporting historically marginalized students, which was a particular passion project of his. TR., Vol. 2, pp. 335–37, 357. McNulty reviewed Warren's job performance

21

positively. TR., Vol. 2, p. 352. When the district decided to create a deputy superintendent position in 2018, Warren applied with McNulty's support. TR., Vol. 2, p. 312.

When Remele expressed surprise about Warren's application, McNulty told her that if Warren was endorsed by his committee, then he was going to recommend that the board hire Warren for the deputy superintendent position. TR., Vol. 2, pp. 312–15. The committee interviewed six to eight candidates, the majority of them black, but ultimately the interview committee did not endorse Warren. TR., Vol. 2, pp. 343, 348. Out of the 16 people on McNulty's 2017–18 executive cabinet hired by the school board, 10 of the cabinet members were female and 11 were black. TR., Vol. 4, pp. 999–1000; TR., Vol. 2, p. 343. McNulty testified that Remele provided leadership to the school board, but "it was not unanimous," and one or two board members were "very independent." TR., Vol. 2, pp. 294–95.

**Warren's Decision to Litigate**. In October 2018, Warren filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that three lesser qualified, younger male applicants were selected to interview for PCSSD's permanent superintendent role and a lesser qualified, younger, white male was selected for the job in violation of her civil rights and in retaliation for her reporting a discriminatory employment practice in district

22

facilities. App. 637; R. Doc. 65-12 at 1. Having received a dismissal and notice of rights from the EEOC, Warren filed suit in federal court in September 2019. App. 1; R. Doc. 1 at 1.

Warren amended her federal complaint twice, eventually suing the district and six of the seven board members individually in her third complaint. App. 552; R. Doc. 65 at 1. The jury found for Warren on two counts of retaliation under Title VII and 42 U.S.C. § 1981a and awarded punitive damages. *See* App. 552; R. Doc. 65 at 1; App. 995, R. Doc. 171 at 5-6. The district court disallowed punitive damages against the school district, but it upheld punitive damages against Linda Remele and Alicia Gillen. *See* App. 995, 1013–14, 1063; R. Docs. 171 at 5-6, 175 at 1-2, 176 at 1, 191 at 1, 6.

The defendants-turned-appellants have timely appealed the trial court's denial of their motion for summary judgment as a matter of law, the entry of judgment against them for retaliation, and the denial of their posttrial requests for relief. App. 1070; R. Doc. 203 at 1.

Appellate Case: 22-2067     Page: 32     Date Filed: 09/23/2022 Entry ID: 5202262

## Summary of the Argument

This Court must vacate the judgment because Warren's complaint about racial inequality in the schools' athletic facilities did not relate to an *employment practice*. Viewing all evidence and inferences in Warren's favor, her conduct is not a protected act under any available legal test. This Court must not assume that Warren's act was legally protected simply because it related to allegations of racial discrimination. Investigating and reporting about racial discrimination was a critical part of Warren's job, and her opposition to racial discrimination on behalf of students in the district did not relate to an *employment practice*. Opposition to racial discrimination must relate to an employer's *employment practice* to be protected under the relevant statutes.

The record as a whole shows that the school district did not retaliate against Warren. This Court has never ruled that denying a job candidate who is serving in an interim position an interview for the permanent job qualifies as a materially adverse employment action, which is what Warren alleges. Nor is there a causal connection on this record sufficient to establish that Warren's reporting was the reason she was not hired for the permanent job. The district established nondiscriminatory reasons why it did not selected Warren as one of the top three finalists for the job, although she was one of the nine top

candidates overall, and Warren did not show that the district's nondiscriminatory reasons were false or a sham.

Because Warren failed to prove one or more elements in her claims for retaliation, the jury's compensatory and punitive damages awards must be reversed. In fact, the issue of punitive damages should never have gone to the jury, at all. Title VII does not allow a plaintiff to recover punitive damages against defendants who are sued in their individual capacity, and there was no evidence that any individual school board member purposely discriminated against Warren because of her race under Section 1981.

Appellate Case: 22-2067    Page: 34    Date Filed: 09/23/2022 Entry ID: 5202262

## Argument

## I. The standard of review is de novo.

This appeal first asks whether the record sufficiently establishes that the appellants intentionally retaliated against Dr. Janice Warren because of statutorily protected conduct. Judgment as a matter of law is proper when a party has been fully heard on an issue, and there is no sufficient legal basis for a jury to find for a party on that issue. When considering the denial of a motion for judgment as a matter of law, an appellate court reviews a district court's decision de novo, viewing the evidence in the light most favorable to the jury's verdict. *Wedow v. City of Kan. City*, 442 F.3d 661, 666 (8th Cir. 2006).

This Court must also decide whether the issue of punitive damages against individual school board members was properly before the jury, which is a legal question for this Court to review de novo. *Kimzey v. Wal-Mart Stores*, 107 F.3d 568, 573 (8th Cir. 1997).

## II. Retaliation Claims

A plaintiff must establish the following three elements in a retaliation claim. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006).

1. **Protected Act.** An employee must show that he or she engaged in a protected act. *Heisler v. Nationwide Mut. Ins. Co*., 931 F.3d 786, 794 (8th Cir. 2019). Identification of the protected act depends on the statute. *Id*.

26

2. **Adverse Employment Action**. The employee must demonstrate that he or she experienced an adverse employment action. An adverse employment action is a material disadvantage like a change in salary, benefits, or responsibilities. *Singletary v. Mo. Dep't of Corr*., 423 F.3d 886, 891 (8th Cir. 2005). An action is also materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68.

3. **Causation.** The employee must demonstrate causation or a connection between the protected activity and the adverse employment decision. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

Title VII prohibits retaliation against employees who opposed any practice made unlawful by Title VII or who made a charge, testified, assisted, or answered questions during an employer's investigation. 42 U.S.C. § 2000e-3(a); *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271 (2009).

Under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), an employee may prove his or her case with circumstantial evidence in the absence of direct evidence of retaliation. The plaintiff must first establish by a preponderance of the evidence the existence of a protected act, an adverse employment action, and a causal connection. *McCullough v. Univ. of Ark. for Med. Scis*., 559 F.3d 855, 864 (8th Cir. 2009). Once a plaintiff has shown a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its decision. *Id*. The plaintiff then must

27

prove by a preponderance of the evidence that the employer's proffered reason was not true but was a pretext for unlawful discrimination.  *Id*.

A Section 1981 retaliation claim is analyzed under the same burden-shifting *McDonnell-Douglas* framework as a Title VII claim. *Wright v. St. Vincent Health Sys*., 730 F.3d 732, 737 (8th Cir. 2013).  Under 42 U.S.C. § 1981, "a plaintiff must initially plead and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

The usual course for an employee engaging in a protected act under Title VII is to participate in the United States Equal Employment Opportunity Commission (EEOC) complaint process or to oppose an employer's unlawful conduct. *See* 42 U.S.C. § 2000e-3(a).  Title VII prohibits discrimination based on an individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-16(a).  But absent discrimination based on one of these enumerated characteristics, an employer's "unfair treatment" of an employee is not an unlawful employment practice under Title VII.  *See Branscomb v. Sec'y of Navy*, 461 F. App'x 901, 906 (11th Cir. 2012); *see also Omogbehin v. Cino*, 485 F. App'x 606, 611 (3d Cir. 2012).

Appellate Case: 22-2067     Page: 37     Date Filed: 09/23/2022 Entry ID: 5202262

Additionally, "[c]onduct is not actionable under Title VII if no reasonable person could have believed the incident violated Title VII's standard." *Barker v. Mo. Dep't of Corr.*, 513 F.3d 831, 835 (8th Cir. 2008) (internal quotations and citations omitted). The Eighth Circuit has held that a belief is unreasonable where no evidence shows that an employer's policy is a pretext for excluding certain people from employment. *Knott v. Missouri Pac. R. Co.*, 527 F.2d 1249, 1252 (8th Cir. 1975).

## A. Warren did not engage in a protected act when she reported disparities between the athletic facilities at Mills High School and Robinson Middle School.

Warren's theory of the case was that the district did not interview her or hire her for the position of permanent superintendent because she revealed certain inequalities between the student athletic facilities at Mills and Robinson. At every stage in the proceeding, appellants argued that Warren's reporting was not a protected act under federal law.

The legal question put forth by Warren's conduct here is a narrow one. Did Warren engage in "opposition" as a protected activity? Warren did not participate in an EEOC investigation or proceeding before the school board's decision to interview and to hire McNulty in April 2018, so the other prong of 42 U.S.C. § 2000e-3(a), known as the "participation prong," is not at issue.

Only the "opposition prong" is at issue here, and it was not triggered by Warren's conduct.

> **(1)    Under this Court's binding precedent, a school employee's report about racial discrimination is not a protected act when it does not relate to an unlawful employment practice.**

To qualify as a protected act, an employee's complaint or report must relate to an employment practice.  42 U.S.C. § 2000e-3(a); *Artis v. Francis Howell*, 161 F.3d 1178 (8th Cir. 1998).  Simply reporting that an employer or other individual engaged in discriminatory behavior is not enough.

For example, in *Artis v. Francis Howell*, 161 F.3d 1178 (8th Cir. 1998), school band boosters hired a specialist (Artis) to help with the marching band. Artis complained that a member of the boosters' executive board used racial slurs against him, and the boosters treated differently a black student who was ineligible for band because of his grades than a white student with a similar academic standing who remained in band. Artis claimed that he was retaliated against for opposing racial discrimination.  *Id*. at 1183.  This Court held that Artis's report that black students were treated less favorably than white students was not protected by Title VII "because such a complaint does not involve an employment practice." *Id*. at 1185.

Even more illuminating is *Evans v. Kansas City School District*, 65 F.3d 98, 99 (8th Cir. 1995).  In *Evans*, the school district was operating under a

30

remedial desegregation court order. The district hired a new high school principal from California and proposed converting the high school to a magnet school to "diversify" its student body, which was more than 98% black at the time. *Id*. at 100. The high school's band teacher objected to the new principal's statement that he hoped the school would become a "Camelot" because the band teacher deemed the principal's statement to be racially insensitive. *Id*. The teacher also spoke up publicly and criticized the magnet program because he felt the program disregarded the needs of the black student body and the court's desegregation order.

This Court held that the teacher's claim that he was retaliated against because of his criticism of the principal and his report that the school failed to comply with a court's desegregation order did not give rise to a cause of action under Title VII or a cause of action under Section 1981. This Court wrote, "the genesis of [the teacher's] claims lies not with any allegation of a discriminatory *employment practice*, but rather with an allegation that [the principal's] efforts to comply with a desegregation directive disregarded the needs of the black student population[.]" *Id*. at 100–01 (emphasis added). That the school disregarded a court desegregation order and neglected black students' needs was not a complaint directed at an employment practice. Here is the reasoning in full:

Appellate Case: 22-2067   Page: 40   Date Filed: 09/23/2022 Entry ID: 5202262

Doctor Cooper's [the principal's] announced course of action with respect to the magnet school program reflected his intention to comply with the district court's desegregation order. Evans [the band teacher] was aware of the desegregation order and magnet program, and thus he cannot avoid scrutiny of his claims by relying on an asserted reasonable belief that his allegations were justified. To the extent that Evans claims a belief that he and the rest of the staff would be required to discriminate, such a belief was simply unfounded and unreasonable in the light of the district court's sweeping desegregation order. Evans could not reasonably believe that the faculty would be excused from complying with a lawfully required directive. Some racial tension apparently existed among the faculty before Dr. Cooper came on board, and Evans expressed concern that Dr. Cooper's plans would not only weaken the strong African-American heritage of Southeast but would also further fragment the staff. Such a concern adds nothing to the claim of unlawful employment action, however, because Dr. Cooper's proposed course of action was in direct conformity with the desegregation order. Likewise, the innocuous reference to "Camelot," given the school's tradition and symbolism, fails to establish Evans' claims as reasonable. Whatever ill-will Dr. Cooper displayed towards Evans as a result of Evans' complaints is simply not remediable under Title VII.

*Id*. at 101.

### (2)   *Other jurisdictions hold that an employee's act of reporting discrimination on behalf of a third party is not protected when the discriminatory act does not relate to an employment practice.*

This Court has not yet directly addressed the extent to which an employee's complaints can be protected acts when the employee's job responsibilities include preventing and investigating discrimination by her employer. But other federal circuit courts have concluded that an employee

Appellate Case: 22-2067     Page: 41     Date Filed: 09/23/2022 Entry ID: 5202262

acting within the scope and course of her employment by investigating and resolving complaints of discrimination is not engaged in a protected act.

Take *Brush v. Sears Holdings Corporation*, 466 F. App'x 781 (11th Cir. 2012). In *Brush*, the Eleventh Circuit held that a manager's opposition to a coworker's rape and the manager's opposition to her employer's handling of the situation was not a protected act because the manager was not lodging a personal complaint. The manager instead was simply performing her assigned job to manage an internal investigation into sexual harassment by her employer. *Id*. at 786.

The Second Circuit came to a similar conclusion in *Wimmer v. Suffolk County Police Department*, 176 F.3d 125 (2d Cir. 1999). In *Wimmer*, the court held that a black police officer—who reported other police officers' racial slurs against black citizens—did not engage in protected activity, and his "claim of retaliation [was] not cognizable under Title VII because his opposition was not directed at an unlawful *employment practice* of his employer." *Id*. at 127.

### (3) *Because Warren did not complain about an employment practice to her employer, the judgment for retaliation must be reversed as a matter of law.*

Warren's complaints did not relate to the terms and conditions of her employment. Rather, her complaints related to the conditions of the students' athletic facilities. This Court must reverse because the district court did not

33

correctly assess whether Warren's reporting related to an *employment practice* as the threshold issue in determining whether her report was a "protected act" under the relevant statutes. *See* App. 941; R. Doc. 90 at 1. Just as this Court in *Evans* did not assume that a teacher complaining about discrimination and noncompliance with a court desegregation order is a protected act, this Court here must not assume that Warren's reporting about discrimination and the district's noncompliance with a desegregation order involves an *employment practice*.

Warren's reporting about discriminatory conditions in student facilities is not statutorily protected. This Court has already established that a school employee's complaint that black students are treated less favorably than white students is not a protected act when the employee's complaint does not arise from a school's employment practice. *Evans*, *supra*; *Artis*, *supra*. Similarly here, that the district spent more money on nicer facilities in a white area and less money on facilities in a black area does not relate to an *employment practice*. An employment practice simply means that the district has limited, segregated, or classified school *employees* in a way that may have deprived a person of employment opportunities because of race, color, or national origin. *See* 42 U.S.C. § 2000e-2. Because the inequities that Warren reported were not

34

related to an employment practice by the district, appellants are entitled to judgment as a matter of law.

### (4)    Warren acted within the scope and course of her employment in opposing the district's allegedly discriminatory conduct, so the judgment for retaliation must be reversed.

This Court must reverse because Warren simply acted within the scope and course of her employment by investigating and reporting about inequities in the schools' athletic facilities. For this reason, her reporting is not a protected act under the law.

It was within the scope and course of Warren's job duties as acting superintendent to respond to a parent's complaint of racial discrimination and investigate. Warren promptly communicated the results of her investigation to the school board and to the district's attorney. While individual members of the school board may have disapproved of how Warren handled those communications, there was never an allegation that communicating about racial discrimination was outside the scope of her job. There is no evidence that Warren stepped outside her role of representing the district to communicate her concerns about disparate racial treatment in the school athletic facilities. In fact, she was a critical witness for the district about the matter. By reporting about the racial discrimination in the construction of these buildings, Warren was not asserting any personal right for herself under Title VI or Section 1981.

35

Communicating about the district's compliance with ongoing equality and desegregation efforts was part of Warren's regular job duties.

At best, Warren's message about the facility inequities alerted the district to the allegedly discriminatory acts undertaken by another district employee, Derek Scott, who had been charged with overseeing both the Mills and Robinson construction projects. Warren's opposition was not directed at an unlawful *employment practice* of the district but rather an act of discrimination by an individual who resigned immediately after the board discovered his material misrepresentations of fact.

### (5) *The record does not support the conclusion that Warren had a good faith, reasonable belief that she was opposing an unlawful employment practice given the totality of the circumstances.*

An employee's complaint may qualify as a protected act when the employee has a good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII. *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1103 (8th Cir. 2018). Here, the record supports the conclusion that Warren had known of disparities between the Mills and Robinson buildings since at least November 2016, when she documented the Joshua Intervenors' numerous complaints. Yet Warren waited more than nine months before she investigated the inequities.

36

Also relevant to Warren's lack of good faith is her email confirmation to the board's attorney that the board had approved the messaging in the supplemental status report that was filed in federal court on September 5, 2017. The record shows that Warren did not solicit any input from the board on this critical document. Warren's preemptive forwarding of a proposed press statement shows that she knew that the situation was likely to receive unfavorable coverage.

Given the totality of the circumstances, the record does not support the conclusion that Warren had a good faith, reasonable belief that she was opposing an unlawful employment practice.

## B. Warren did not establish an adverse employment action, because she resumed her previous position as assistant superintendent after the board hired McNulty.

Warren claimed that she suffered an adverse employment action when the district did not select her as a finalist to interview for the permanent superintendent position and when she was not offered the job. Recall that out of 38 "very strong" applicants, Warren was selected as one of the top nine candidates. Out of the nine semifinalists who gave video presentations to the board, Warren did not score in the top three. Consequently, Warren did not receive an offer to interview in person and was not ultimately hired for the position. Warren completed her interim superintendent contract, and she

37

returned as assistant superintendent for the 2018–19 school year serving under McNulty.

A reassignment in which an employee retains her rank and substantive responsibilities is usually not an adverse employment action for Title VII purposes. *See Henthorn v. Capitol Communs., Inc*., 359 F.3d 1021, 1029 (8th Cir. 2004) (No adverse employment action when terms and conditions of employment did not change); *see also Twymon v. Wells Fargo & Co*., 403 F. Supp. 2d 921, 948–49 (S.D. Iowa 2005) (Placing employee on an improvement plan because of poor performance when the employee retained the same position, performed the same duties, and received the same pay, did not establish an adverse employment action for purposes of a retaliation claim).

Whether an employment action is adverse generally depends on comparing the position the plaintiff held before the alleged adverse action and the position he or she holds after the alleged adverse employment action. *See Givens v. Cingular Wireless*, 396 F.3d 998 (8th Cir. 2005). Courts will look to see if the employment action is "detrimental" to the terms and conditions of employment—including whether the employee has fewer responsibilities after the allegedly adverse action. *Id*; *Henthorn*; *supra*.

Here, Warren has failed to establish that the board's decision not to interview her as a finalist for the permanent superintendent position posed a

substantial risk to her employment or other benefits. Moreover, she did not allege, much less prove, that any other employment adversities occurred after the finalists were selected. Warren retained the same salary and position that she had before she agreed to take the interim job with the district. Warren's Title VII retaliation claim therefore fails because she has not established that she suffered an adverse employment action.

The result is just and fair because the school board in its discretion opened up the superintendent search to potential candidates from across the United States. That a highly qualified candidate like Warren was not selected only shows how competitive and robust the search was.

This Court has never ruled that denying a job candidate a finalist slot qualifies as a materially adverse employment action. This is especially true when no other employment conditions have been impacted. Even under a broad definition of adverse employment action, the record is devoid of any evidence that Warren suffered a reduction in pay, denial of promotion, a change in future career prospects, a refusal to hire, a demotion, a suspension, a discharge, or work-related threats, warnings, reprimands, transfers, or negative evaluations. Courts do not act as pseudo school boards. Warren received the full benefit of her contractual bargain. She agreed to serve as interim superintendent for a one-year term from July 18, 2017, to July 1, 2018, and that term was completed

with no quarrels. There was no guarantee—express or implied—that Warren would be selected for the permanent position.

After the board's decision to hire McNulty, Warren retained the same salary and benefits after the selection process that she had before the selection process. Because Warren finished out her contractual term as interim superintendent and then resumed her previous position as assistant superintendent, the record does not establish that Warren suffered an adverse employment action. Warren therefore has failed to make a prima facie case of retaliation.

**C. Warren has not shown that "but for" her protected act, she would have been interviewed as a finalist and hired as the permanent superintendent.**

As the plaintiff, Warren must show that the alleged unlawful retaliation would not have occurred but for her engaging in a protected act. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013). The claimant may satisfy this burden by showing that the employer's reasons for its action are pretextual. A plaintiff may demonstrate pretext by showing that the employer's proffered explanation is false and not the real reason for the action. *See Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 738 (8th Cir. 2013). The law, however, requires a plaintiff to generally show more than a temporal connection to establish a retaliation claim. *EEOC v. Kohler Co.*, 335 F.3d 766, 773 n.7

40

(8th Cir. 2003) ("[T]iming alone is usually insufficient to establish that the employer's legitimate non-discriminatory reason for discharge is pretext.").

The passage of time undercuts any inference of causality in this case. Warren claimed that she was punished for reporting that the district had failed to comply with the court's desegregation order by building better facilities at Robinson Middle School than at Mills High School. She says that the retaliation happened when the board opened up the search nationally and decided not to interview her as a finalist. Yet the testimony established that the board had already decided when they hired Warren as interim superintendent that they were going to conduct a national search to get "fresh eyes from outside of Arkansas." Statement of the Case, p. 17.

The temporal proximity of eight months between the alleged protected act and the alleged adverse employment action indicates no causation at all. And that six out of nine candidates for the permanent superintendent position were black; two of the board members evaluating the video interviews were black; and all members independently used a consensus-building matrix do not support the inference that rejecting Warren as a finalist was motivated by racial animus. As black board member Shelby Thomas said, sometimes you do not get the job you want and "[t]hat's life." Statement of the Case, p. 20.

Appellate Case: 22-2067    Page: 50    Date Filed: 09/23/2022 Entry ID: 5202262

### D. The district established nondiscriminatory reasons why Warren was not interviewed as a finalist or hired as permanent superintendent.

Assuming for the sake of argument that Warren established the elements for a retaliation claim—meaning she established a protected act, an adverse employment action, and causation—the district showed that it would have performed the same action (interviewing the finalists and hiring McNulty) *even if* Warren had not reported the disparities in the athletic facilities. Four main nondiscriminatory reasons for Warren's nonhire were established at trial.

First, the application process was highly competitive and extremely selective. As already discussed in *Section IC*, *supra*, when the board fired Superintendent Guess and hired Warren as interim superintendent in July 2017, it had already decided to conduct a national search for the permanent position. While Warren was welcome to apply for the permanent superintendent position, and in fact did apply, the board's decision to conduct a nationwide search made the selection process even more competitive. That Warren made the cut for the top nine candidates speaks highly to her distinguished qualifications. That Warren—along with the other black female semifinalist, Sharon Griffin, and four other men—did not make the cut for the final three candidates speaks to the extremely selective interview process, which the board conducted in a nondiscriminatory manner.

Second, Warren's choice in how to communicate with the board about the necessary revisions to the status report in September 2017 was detrimental to her working relationship with some of the school board members. While the board agreed with Warren that the discrepancies between the facilities at Mills and Robinson were unfair and needed to be remedied, Warren failed to share the draft supplemental status report with the board in a timeframe that allowed the board to give input into the published, finalized version. Even more concerning, Warren represented to the board's attorney, Sam Jones, that the board had been fully informed. Importantly, facilities was one of the areas where the district had not yet been found in "unitary" status in the desegregation case. Warren's method of communication about this sensitive and important issue proved to be a significant problem to some board members and is a nondiscriminatory reason for her to not have progressed as a final interviewee.

Third, the board did not like some of the changes that Warren made shortly after taking office. Only one day after starting her new role as interim superintendent, Warren started remodeling the superintendent's office. When the board learned of this, it instructed Warren not to make any other renovations or major purchases given her temporary role. Some board members were also

43

upset that Warren had purchased brand new office furniture for the superintendent suite.

Fourth, Warren made some discretionary decisions during her interim job that reflected poorly on her performance to the board. In November 2017, Warren hired high school testing coordinators who did not convey any substantial benefit to the district until April 2018. This meant that the district subsidized the coordinators' pay for six months before any testing coordination happened. And in December 2017, Warren ordered 150 umbrellas to give as Christmas presents, which was an inappropriate expense for taxpayers as determined by the state auditor.[3]

In short, it is the official duty of the school board to select and employ a superintendent. The PCSSD board set out to fulfill this duty and hired Ray & Associates to conduct a national search. Six highly qualified black candidates presented to the board—including Warren. Ultimately the board chose McNulty based on neutral criteria in a 6–1 decision. It was the board's right to select its preferred candidate over other candidates. McNulty's detailed preparations and outstanding interview, coupled with the board's crumbling faith in Warren, demonstrated that it had legitimate, nonretaliatory reasons for declining to select Warren as a finalist and for hiring McNulty.

---

[3] Warren paid for the umbrellas from her personal funds.

Appellate Case: 22-2067    Page: 53    Date Filed: 09/23/2022 Entry ID: 5202262

**E.  The record shows that Warren did not rebut the board's nondiscriminatory reasons for selecting the interview finalists and its eventual hire of McNulty.**

Once the appellants articulated at least one legitimate reason for their decision not to move Warren forward to the final round of interviews, Warren had to show that the stated reason was a pretext for discrimination. *See Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007). This Court has explained the burden of proof as follows:

> To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason. This burden will not be met by simply showing that the reason advanced by the employer was false; rather, [the plaintiff] must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations. Specifically, the plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

*Wilking v. Cty. of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998) (internal quotations and citations omitted). Additionally, this Court cannot second-guess the board's hiring decision as a "super-personnel department." *Harvey v. Anheuser-Busch, Inc*., 38 F.3d 968, 973 (8th Cir. 1994).

Here, Warren has not established sufficient evidence for a reasonable trier of fact to infer discrimination.  While Warren insinuated at trial that Remele and Gillen completed the consensus matrix in such a way as to torpedo Warren's total score, there was no proof that this happened.  It was merely

45

conjecture and speculation. Moreover, the selection process that the board used allowed individual board members discretion to independently compare and score the nine candidates how they wished for any lawful reason. And appellants presented lawful reasons that individual board members may have used to score Warren less favorably than other candidates.

While Warren understandably felt that she was the best candidate for the job and that the board treated her unfairly, "unfairness" is not the issue to be decided in this appeal by an appellate court. The issue, should the court reach it, is whether there was sufficient evidence for the jury to conclude that the district's justification was a pretext for an illegal discriminatory motive.

This record establishes that Warren was treated the same as all the other candidates who were similarly situated in the process. Warren offered no evidence to dispute the appellants' testimony that the board selected the top three finalists using a neutral framework and after viewing the top nine candidates' application packets and video presentations. No facts reveal that the board behaved with discriminatory motives in a highly competitive process by selecting the three interview finalists and ultimately choosing McNulty.

Because Warren failed to show that the board's proffered reasons were false or motivated by discriminatory motives, this Court must reverse.

**F. Warren failed to prove one or more elements of her claims for retaliation, so the related damages award must be reversed.**

Considering the evidence in the light most favorable to Warren and giving her the benefit of all reasonable inferences, Warren has not met her burden of proving an evidentiary basis to justify any monetary recovery. This is because she has failed to prove one or more elements of her retaliation claims. When a court reverses on an underlying claim, the damages award must also be reversed. *See, e.g.*, *Howard v. Burns Bros.*, 149 F.3d 835, 843 (8th Cir. 1998). This Court has no choice but to reverse the jury's award of $208,022.40 in lost wages and benefits and $125,000 in other damages because one or more of the elements of Warren's retaliation claims are lacking.

Punitive damages against the individual defendants must also be reversed because there is insufficient evidence of retaliation on this record. Additional reasons to reverse the punitive damages award are discussed in the following section.

### III. Punitive Damages

The issue of punitive damages arose multiple times throughout this case. Before trial, the appellants sought to limit any testimony about punitive damages. App. 950–53; R. Docs. 135-36 at 1-2. Their request was denied. App. 954; R. Doc. 141 at 1. In the motion for directed verdict, renewed motion for directed verdict, and posttrial motion to set aside the judgment, the

47

appellants argued that Warren could not recover punitive damages against any defendant for any of her Title VII and Section 1981 retaliation claims. App. 955, 1018; R. Doc. 161 at 1; R. Doc. 182 at 1, 6. They also argued that Warren was not entitled to punitive damages because she failed to show that any appellant acted with evil motive or intent or with reckless or callous indifference to her protected rights. *E.g.*, App. 960, R. Doc. 161 at 6.

The jury assessed $273,000 in punitive damages against the school district, $25,000 in punitive damages against Linda Remele, and $25,000 in punitive damages against Alicia Gillen. Add. 23. The district court partially agreed with the appellants' legal arguments and set aside $273,000 in punitive damages against the school district. Add. 29. The district court, however, rejected the appellants' arguments that the punitive damages assessed against the individual school board members must be vacated. Add. 31. The court instead entered a judgment that included the $50,000 in punitive damages assessed against Remele and Gillen individually. Add. 31.

## A. Because there is insufficient evidence as a matter of law to support Warren's retaliation claim, the jury's award of punitive damages cannot stand.

As argued in *Section II(A)*, *supra*, Warren's retaliation claims must fail as a matter of law, among other things, because the district court should not have given the legal question of whether Warren engaged in a protected act to

48

the jury to decide. Retaliation is the only theory of recovery on which the jury awarded damages to Warren. Because there is insufficient evidence on one or more of the elements of the retaliation claims, the jury's damages award must be reversed. *See Section I(F)*, *supra*. And once an underlying damages award has been eliminated, the punitive damages awarded on that claim must also be vacated, because punitive damages are unavailable without compensatory damages. *Fletcher v. Price Chopper Foods of Trumann, Inc*., 220 F.3d 871, 879 (8th Cir. 2000). This Court must therefore vacate the $50,000 punitive damages award as a matter of law.

**B. The Supreme Court of the United States only allows a recovery of punitive damages if the plaintiff proves intentional discrimination, the plaintiff was the person harmed, and the defendant's conduct was illegal.**

Punitive damages for retaliation are generally governed by the same statute that prohibits the discrimination itself. Under Title VII, the standard for punitive damages is whether the defendant acted "with malice or with reckless indifference to the [plaintiff's] federally protected rights." 42 U.S.C. § 1981a(b)(1). The standard under Section 1981 is whether the defendant acted with malice, an evil motive, or reckless or callous indifference to a federally protected right. *Jin Ku Kim v. Nash Finch Co*., 123 F.3d 1046, 1066 (8th Cir. 1997).

The Supreme Court of the United States has limited the availability of punitive damages to a subset of cases involving intentional discrimination. *Kolstad v. ADA*, 527 U.S. 526, 534 (1999). Punitive damages are not available when the plaintiff alleges that a neutral employment practice has an adverse impact or when an employer acted with mixed motives. 42 U.S.C. § 1981a(a)(1); 42 U.S.C. § 2000e-5(g)(2). Punitive damages are only available in cases in which a respondent other than a government, government agency, or political subdivision has engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual. *Kolstad*, 527 U.S. at 534. The terms "malice" and "reckless indifference" relate to the defendant's mental state or intent. *Id*.

Moreover, punitive damages cannot include an amount for harm suffered by persons who are not parties to the case. *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007). And punitive damages cannot be awarded for a defendant's conduct that was legal. *See State Farm Mut. Auto. Inc. Co. v. Campbell*, 538 U.S. 408, 422 (2003). "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id*. at 419.

Appellate Case: 22-2067    Page: 59    Date Filed: 09/23/2022 Entry ID: 5202262

**C. The law does not allow Remele and Gillen to be held liable as individuals for punitive damages under Title VII.**

Congress has chosen to limit the burdens of complying with Title VII to employers with at least fifteen employees. *See* 42 U.S.C. § 2000e(b). The statutory definition of "employer" does not specifically include individuals, and Title VII defines an employer as a person employing a minimum number of persons. *See* 42 U.S.C. § 2000e(b). This Court held in *Lenhardt v. Basic Institute of Technology*, 55 F.3d 377, 381 (8th Cir. 1995), that a person cannot be held liable under Title VII in his or her individual capacity. The law therefore does not subject Remele and Warren to individual liability under Title VII. Consequently, this Court must reverse the punitive damages award entered against Remele and Gillen individually.

**D. The law does not allow Remele and Gillen to be held liable as individuals for punitive damages under Section 1981.**

The Supreme Court of the United States has held that both Title VII and Section 1981 allows for retaliation claims and that there is "necessary overlap" between the two statutes. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008). Here, it is unclear whether the jury awarded punitive damages based

51

upon Warren's Title VII retaliation claim or her Section 1981 retaliation claim, so the appellants have challenged both grounds.[4]

As argued by the appellants in their directed-verdict motions and posttrial motion, Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts but it does not extend to Warren's advocacy for nondiscriminatory school facilities on the behalf of students. The protections embodied in Section 1981 simply do not permit recovery of punitive damages against individuals unless the plaintiff had a protection from retaliation for reasons related to "the enforcement of the express statutory right." *Humphries*, 553 U.S. at 452. Because Warren's report about unequal facilities did not relate to a statutory right under Section 1981, it was reversible error to allow the recovery of punitive damages against Remele and Gillen as individuals.

## E. Warren did not establish that Remele or Gillen acted with malice or with reckless indifference to her protected rights.

To hold a defendant personally liable under Section 1981, the plaintiff must prove that the individual defendant intentionally discriminated. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982) ("§ 1981,

---

[4] The district court rejected the appellants' proffered jury instructions on the issue. TR., Vol. 6, p. 1216.

Appellate Case: 22-2067    Page: 61    Date Filed: 09/23/2022 Entry ID: 5202262

like the Equal Protection Clause, can be violated only by purposeful discrimination[.]"). To establish entitlement to punitive damages for retaliation under Section 1981 against a person in his or her individual capacity, the plaintiff must prove that the individual defendant acted with malice, an evil motive, or reckless or callous indifference to a federally protected right and that the plaintiff's race was the "but-for" factor in suffering the loss of his or her legally protected right. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *Jin Ku Kim v. Nash Finch Co*., 123 F.3d 1046, 1066 (8th Cir. 1997).

Federal appeals courts considering this issue have evaluated closely the nature of the defendants' conduct to decide whether there was sufficient evidence of a reckless or malicious mental state to support punitive damages. The cases described in the following paragraphs provide examples of when an appellate court has upheld punitive damages for intentional discrimination and when an appellate court has reversed punitive damages.

In *EEOC v. Gaddis*, 733 F.2d 1373, 1380 (10th Cir. 1984), an Oklahoma newspaper offered a job to a person living in California, because a current employee had recommended him. The new hire, who had been the current employee's college roommate, accepted the job and his name was posted as a new employee. *Id*. at 1379. The newspaper owner met the plaintiff for the first

time when he reported for work. The owner was visibly upset when he discovered that the plaintiff was black. The owner stated that a black person would never be allowed to work in the office and fired the plaintiff a few days later. Although the newspaper denied expressing any racial prejudice and further claimed that no job vacancy existed, two white males were hired to do the plaintiff's job. The Tenth Circuit reasoned that this conduct deserved punitive damages.

Although the case did not involve racial discrimination, this Court's holding in *Lawrence v. CNF Transportation, Inc*., 340 F.3d 486, 495 (8th Cir. 2003), illustrates the plaintiff's "formidable burden" in proving punitive damages. In *Lawrence*, a male supervisor's statements to a female employee that divorced women were "just looking for anything" and that the employee "makes damn good money for a woman" among other disparaging comments did not support a finding that the employer acted with malice or reckless indifference to the employee's federally protected rights. *Id*. at 496–97. The court held that there was insufficient evidence to support the jury's decision to award the plaintiff $1 million in punitive damages. *Id*.

This Court must reverse because (1) Remele and Gillen's behavior in this case is totally unlike the reprehensible behavior supporting punitive damages in *Gaddis*; and (2) Warren has failed to meet her "formidable" burden of proof

like the plaintiff in *Lawrence*. To be liable for punitive damages, Remele and Gillen must have discriminated in the face of a perceived risk that their actions would violate federal law. There is no such evidence here. As the plaintiff, Warren presented no evidence to support the conclusion that Remele or Gillen were aware that they may have been acting in violation of federal law or that these women engaged in conscious, purposeful discrimination.

There is no evidence in the record that Remele or Gillen planned to conceal or attempted to cover up what Warren reported about the school facilities. The record is similarly devoid of any evidence that Remele or Gillen knew about or ratified the unscrupulous behavior of Derek Scott. Their lack of knowledge cuts against any inference of intentional discrimination. These women appreciated that Warren brought the problem of unequal facilities to the board's attention so it could be fixed. Remele and Gillen's actions after they were informed about the discrimination in athletic facilities show that they acted swiftly to remedy those problems. The entire board, including Remele and Gillen, unanimously voted to rectify any discrepancies or inequalities by shoring up the Mills facilities to equal those at Robinson.

There is not a factual basis to support the idea that Remele or Gillen threatened or took deliberate retaliatory action against Warren because of her report regarding unequal facilities based on race. The supplemental status

55

report was filed in federal court and almost immediately the district received bad press in the newspaper. Yet Warren was not fired or demoted. She, along with five other black persons, made the cut for the top nine candidates for the final position eight months later. And in Warren's history with PCSSD there was no previous allegation of discrimination. Neither was there proof that she had frequently been punished for opposing a discriminatory employment practice. In the end, Warren had the same contractual pay and benefits after the board conducted interviews for the permanent position as she did before the interviews.

Looking closely at Gillen and Remele's conduct as established on this record, there is no evidentiary basis to support the conclusion that they purposefully discriminated against Warren because of her race. For this simple reason, any punitive damages assessed against them individually under Section 1981 must be reversed.

# Conclusion

The record contains insufficient evidence that Warren:

- Engaged in a protected act;
- Experienced an adverse employment decision; or
- Established a connection between the protected act and the adverse employment decision.

In the absence of any evidence of retaliation, the appellants are entitled to judgment as a matter of law. This Court must therefore vacate the judgment—including all money damages—and dismiss Warren's claims.

Respectfully submitted,

BEQUETTE, BILLINGSLEY & KEES, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201-3469
Phone: (501) 374-1107
Fax: (501) 374-5092
Email: jbequette@bbpalaw.com
Email: ckees@bbpalaw.com

By: _____ **/s/ W. Cody Kees** _____
    Jay Bequette, Ark. Bar #87012
    W. Cody Kees, Ark. Bar #2012118

*Attorneys for Appellants*

57

## Certificate of Compliance

I hereby certify that the following statements are true:

1. This brief complies with the type-volume limitations imposed by Federal Rule of Appellate Procedure 32(a)(7)(B)(i). It contains about 12,650 words, excluding the parts of the brief exempted by Federal Rule 32(f).

2. This brief complies with the typeface and typestyle requirements of Federal Rule 32(a)(5) and 32(a)(6). It has been prepared in a proportionally-spaced typeface using Microsoft Office 365 Word in 14-point Times New Roman font.

3. This brief complies with the electronic filing requirements of Eighth Circuit Rule 28A(h). The electronic version of this brief and addendum have been scanned for viruses and are virus free.

      **/s/ W. Cody Kees**
Attorney for Defendants-Appellants
Dated: September 23, 2022

58

**Certificate of Service**

I certify that on the date indicated below, I filed the foregoing document with the clerk of the court, using the CM/ECF system, which will automatically send notification and a copy of the brief to the counsel of record for the parties. I further certify that all parties to this case are represented by counsel of record who are CM/ECF participants. A paper copy of the brief will be filed on opposing counsel within five days after the electronic version of the brief is approved for filing.  *See* 8th Cir. R. 28A(d).

                    **/s/ W. Cody Kees**
                    Attorney for Defendants-Appellants
                    Dated: September 23, 2022